IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

RAQUEL SMITH,                          )
                                       )
         Plaintiff,                    )
                                       )
    v.                                 )  CASE NO. 3:08-CV-414-WKW[WO]
                                       )
SOUTHERN UNION COMMUNITY               )
COLLEGE,                               )
                                       )
         Defendant.                    )

## MEMORANDUM OPINON AND ORDER

## I. INTRODUCTION

Plaintiff Raquel Smith ("Smith"), who is African-American, brings this race discrimination and retaliation action against her former employer, Southern Union Community College ("Southern Union"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17 ("Title VII").[1]  Ms. Smith asserts that she was terminated from her temporary appointment as a Recruiter/Academic Advisor based upon her race, and that she applied for a permanent appointment to the same job title, but was denied the appointment based upon her race and in retaliation for having filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

Before the court is Southern Union's Motion for Summary Judgment (Doc. # 20), which is accompanied by a brief (Doc. # 21) and an evidentiary submission (Doc. # 20).  Ms.

---

[1] Contrary to Ms. Smith's statement in her brief (Pl. Resp. 23 (Doc. # 25)), a violation of 42 U.S.C. § 1981 is not alleged in the Complaint.

Smith filed a response (Doc. # 25) and an evidentiary submission (Doc. # 24).  Based upon a careful consideration of the arguments of counsel, the relevant law and the record as a whole, the court finds that the motion for summary judgment is due to be denied.

## II.  JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343 (civil rights jurisdiction).  Personal jurisdiction and venue are adequately pleaded and are not contested.

## III.  STANDARD OF REVIEW

Summary judgment should be granted only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  Under Rule 56, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant can meet this burden by presenting evidence showing there is no genuine issue of material fact, or by showing that the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24.  "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).

2

Once the moving party has met its burden, "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Rule 56(e)(2).  To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A genuine factual dispute exists if "a reasonable jury could return a verdict for the non-moving party." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (internal quotation marks and citation omitted).

## IV.  FACTS[2]

Ms. Smith formerly was employed by Southern Union, a community college with campuses located in Wadley, Opelika and Valley, Alabama.  Ms. Smith was hired pursuant to a temporary appointment as a Recruiter/Academic Advisor at the Opelika campus, effective February 10, 2006.  Although Ms. Smith's Letter of Appointment does not indicate the duration of her appointment (Def. Ex. 25 (Doc. # 24-26)), the pertinent policies dictate that a temporary appointment may not exceed one year, unless an extension is obtained from the chancellor (Ex. C to Salatto Aff. (Doc. # 20-11, at 10)).  Ms. Smith's temporary appointment was extended until August 31, 2007, at the request of then-President Susan Salatto ("President Salatto").  (Pl. Decl. ¶ 3 (Doc. # 24-2).)

---

[2] The material facts are presented in the light most favorable to Ms. Smith, but it is recognized that many of those facts are in dispute.  Facts which are immaterial to the pivotal issues are omitted.

There is evidence that a Southern Union employee is considered "tenured" after three years of employment (Salatto Dep. 27-28, 36, 45 (Ex. to Doc. # 20)), but Ms. Smith did not reach the three-year mark. Another extension of Ms. Smith's temporary appointment was not sought. (Salatto Dep. 61.) Instead, on August 14, 2007, President Salatto hand-delivered to Ms. Smith a letter stating that her "employment with Southern Union . . . is terminated effective August 31, 2007." (Pl. Ex. 35 (Doc. # 24).) This came as a "surprise[]" to Ms. Smith.[3] (Pl. Decl. ¶ 13.)

According to President Salatto, Ms. Smith was terminated because August 31, 2007 was the end of the extension of her temporary appointment and Southern Union intended to advertise and fill the position as a permanent appointment. (Def. Br. 6-7 (Doc. # 21); Salatto Aff. 2 (Doc. # 20-11).) In fact, a permanent position for a Recruiter/Academic Advisor position had been advertised for several weeks prior to Ms. Smith receiving her termination letter (Advertisement (Doc. # 24-35)), and Ms. Smith had applied for that position the day prior to receiving her termination letter (Pl. Dep. 123).[4]

---

[3] Ms. Smith was under the impression that if she performed her job satisfactorily, she would remain in her present position for a three-year period at which time she would become a tenured employee. (Pl. Decl. ¶ 3.) Ms. Smith's belief, even if proved wrong, is not inconsistent with a finding made when an onsite review of Southern Union's human resources practices was conducted in 2007 at the request of Chancellor Bradley Byrne. Namely, that finding was that, "from a review of random temporary jobs and reorganization[,] it is more likely that if an employee takes a temporary position[,] in a few years the position becomes permanent for that employee, without being advertised." (Southern Union Cmty. College Review, Executive Summary, at 24 (Pl. Ex. 2 to Doc. # 24).)

[4] Ms. Smith did not know that she would receive a letter of termination the next day.

4

Around the same time that Ms. Smith was notified of her termination, President Salatto effected a one-person "reorganization" (Salatto Dep. 69), and appointed Carol Howell ("Howell"), a Caucasian employee, into a permanent position as a Recruiter/Academic Advisor at the Opelika campus where Ms. Smith also worked.[5]  (Salatto Dep. 15, 50.)  The reorganization resulted in a 25 percent pay increase for Ms. Howell.  (Salatto Dep. 67.)  Because that appointment was made based upon a "reorganization," the applicable policies did not require President Salatto to advertise the position or to accept applications.  (Salatto Dep. 51, 68, 71-72.)  Believing that her termination was discriminatory and that she was treated unfavorably as compared to Ms. Howell, Ms. Smith filed an EEOC charge on September 7, 2007.  (Pl. EEOC Charge (Ex. 38 to Doc. # 24).)

As to the advertised position for which Ms. Smith had applied, a memorandum dated September 18, 2007, reflects that the committee chose ten applicants, including Ms. Smith, for an interview.  The interviews were conducted by the committee which narrowed the applicants to three.  Ms. Smith did not make the cut.  As reflected in the committee's memorandum dated October 4, 2007, the three finalists were recommended to President Salatto for a final interview.  (Ex. 26 to Salatto Dep. (Doc. # 20-7, at 25).)  It is undisputed that an African-American female was selected for the position.  (Salatto Aff. 2.)

Ms. Smith filed this lawsuit on June 2, 2008, asserting claims pursuant to Title VII.  After a period of discovery, the present motion for summary judgment was filed.

---

[5] Ms. Howell's contract for the promotional appointment to Recruiter/Academic Advisor is dated August 13, 2007.  (Howell's Contract of Employment (Pl. Ex. 20 to Doc. # 24).)

## V. DISCUSSION

Ms. Smith seeks to prove discriminatory and retaliatory intent on the part of Southern Union based upon circumstantial evidence.  The analysis, therefore, is governed by the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  "Under the *McDonnell Douglas* framework, a plaintiff first must show an inference of discriminatory intent, and thus carries the initial burden of establishing a *prima facie* case of discrimination."  *Brooks v. County Comm'n*, 446 F.3d 1160, 1162 (11th Cir. 2006).  Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer "to 'articulate some legitimate, nondiscriminatory reason' for the adverse employment action."[6]  *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008) (quoting *McDonnell Douglas*, 411 U.S. at 802).  If the employer meets its burden, the burden shifts back to the plaintiff to show that the employer's stated reason for the adverse employment action was a "pretext" for discrimination.  *Id.*  The pretext inquiry requires a determination, based upon the totality of the evidence,[7] as to whether the plaintiff "'has cast sufficient doubt on the defendant's proffered nondiscriminatory reason[] to permit a reasonable factfinder to conclude that the employer's proffered legitimate reason[] [was] not what actually motivated its conduct.'"

---

[6] The principles in *Brooks* and *Crawford* apply equally to retaliation claims.  *See Wright v. Southland Corp.*, 187 F.3d 1287, 1305 (11th Cir. 1999) ("[T]he same analytical framework applies to retaliation claims as applies to other employment discrimination claims, including the availability of the *McDonnell Douglas* presumption.").

[7] The entire record must be considered, and it must be considered in the light most favorable to the non-movant.  *See, e.g.*, *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997).

*Id.* (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997) (brackets added)).

## A.   Termination Claim

### 1.   Prima Facie Case

Southern Union says that Ms. Smith cannot establish a *prima facie* case on her racial termination claim because she has not demonstrated that she was treated differently than a similarly-situated Caucasian employee.  Ms. Smith, however, can bypass the "similarly situated" prong of the *prima facie* case by demonstrating instead that she was replaced by someone outside her protected class.[8]  *See Maynard v. Bd. of Regents,* 342 F.3d 1281, 1289 (11th Cir. 2003).  And, here, Ms. Smith claims that she was "replaced" by Ms. Howell, who is Caucasian.  (Pl. Resp. 15 (Doc. # 25).).

Construed favorably to Ms. Smith, the following evidence weighs in her favor.  First, Ms. Howell was appointed to a position with the same job title and duties as the position being vacated by Ms. Smith's termination.  (Salatto Dep. at 15-17, 50-51.)  Second, there is a temporal link between Ms. Howell's appointment to the position of Recruiter/Academic Advisor and Ms. Smith's termination.  Namely, Ms. Howell's contract of employment, which is dated August 13, 2007, precedes the date Ms. Smith received notification of her

---

[8] Southern Union's argument focuses only on the fourth *prima facie* element.  The other three elements are not at issue, *i.e.*, that Ms. Smith is a member of a protected class, that she was qualified to work as a Recruiter/Academic Advisor and that she suffered an adverse employment action when she was terminated.  *See Maynard*, 342 F.3d at 1289.  These three elements are presumed established for purposes of this opinion, and the analysis is confined to the fourth element.

termination by merely one day.  Third, Ms. Howell was moved from the Wadley campus to the Opelika campus when appointed to the position of Recruiter/Academic Advisor (Salatto Dep. 47, 49); hence, Ms. Howell was relocated to the same campus where Ms. Smith worked. Fourth, the employee whose resignation allegedly created the opening that permitted Ms. Howell to move into a Recruiter/Academic Advisor position did not bear the same title or have the same job duties.  (Salatto Dep. 20-21, 49.)  Fifth, the decisionmaker who orchestrated the reorganization for Ms. Howell and terminated Ms. Smith's employment is the same (President Salatto).

As argued by Southern Union, there also is evidence that weighs in its favor.  First, there were two positions for Recruiter/Academic Advisor, not one, and Ms. Smith's termination did not result in the elimination of one of those two positions.  Second, but weaker, Ms. Howell was reorganized into her position *prior to* the date of Ms. Smith's termination.  According to Southern Union, it should be inferred from the two-week overlap in employment that Ms. Howell did not replace Ms. Smith.  (Salatto Dep. 16, 17, 51.)  Third, there is evidence that the then-chancellor extended Ms. Smith's temporary appointment, but with the caveat that a "search [would] be conducted to fill th[at] position on a permanent basis."  (Corts Letter (Ex. 8 to Salatto Dep.); Salatto Dep. 62.)  The letter's inference urged by Southern Union is that the African-American applicant who was selected as a result of the advertised Recruiter/Academic Advisor position is the one who replaced Ms. Smith.

8

Based on the foregoing, the court finds that the evidence contains opposing facts and reasonable but competing inferences as to who replaced Ms. Smith, creating the requisite genuine issue of material fact and making summary judgment in favor of Southern Union inappropriate.  In other words, drawing all reasonable inferences in Ms. Smith's favor, the court finds that, although disputed by Southern Union, there is enough evidence to establish the fourth element of the *prima facie* case.  No other element being challenged, Ms. Smith has sustained her *prima facie* burden.

### 2.     *Legitimate, Non-Discriminatory Reason*

Southern Union has presented competent evidence of a legitimate, non-discriminatory reason for terminating Ms. Smith, and no argument to the contrary has been made.  Namely, President Salatto has testified that Ms. Smith was terminated because the extension of her appointment had ended and the Recruiter/Academic Advisor position was going to be filled as a permanent position based upon a competitive application process.  (Salatto Aff. 2; Salatto Dep. 62.)  The analysis, thus, turns to pretext.

### 3.     *Pretext*

Ms. Smith's evidence of pretext focuses on Southern Union's alleged failure to apply its written policies in an "even-handed [sic] . . . manner."  (Pl. Resp.; *see also* Pl. Resp. 19 (Southern Union "selectively applied its policies and procedures.").)  In the Eleventh Circuit, "[d]epartures from normal procedures may be suggestive of discrimination."  *Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985).  Deviations from employer policies are even

more "suspicious" where there is evidence that "established rules were bent or broken to give a non-minority applicant an edge[.]" *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 644 (11th Cir. 1998).

The court agrees with Ms. Smith that there is sufficient circumstantial evidence, when combined with the *prima facie* case, from which a reasonable jury could side with Ms. Smith on the issue of pretext. As to Southern Union's overall practices, there is evidence that written policies for posting vacancies were not consistently followed. The onsite reviews conducted in the fall of 2007 revealed that Southern Union failed to ensure that "all open positions" were "posted" and "advertised as required[.]" (Southern Union Cmty. College Review, Executive Summary, at 24 (Pl. Ex. 2 (Doc. # 24); *see also* Pl. Resp. 6.) The suspicion of policy deviation in this case is heightened based upon the evidence that President Salatto created a new Recruiter/Academic Advisor position at the Opelika campus, but rather than handling the new position as a vacancy subject to the advertising and competitive selection policies (Pl. Ex. 12, at 3; Salatto Dep. 109), she appointed Ms. Howell to that position, thereby foreclosing a competitive application process for that position (Salatto Dep. 15, 17, 72-73, 78, 96; Pl. Ex. 12, at 4) and at the same time effectuating a 25 percent increase in Ms. Howell's salary (Salatto Dep. 67).[9]

---

[9] The position at the Wadley campus that was vacated by Ms. Howell when she was moved into the position of Recruiter/Academic Advisor was advertised, in accordance with governing written procedures. (Salatto Dep. 69.)

Moreover, the onsite review also resulted in a finding that after reviewing "random temporary jobs and reorganizations," . . . it was "likely that if an employee t[ook] a temporary position[,] in a few years the position [would] become[] permanent for that employee, without being advertised.'" (Southern Union Cmty. College Review, Executive Summary, at 24.) This finding from the onsite review again bears on Southern Union's failure to adhere to its written policies for competitive recruitment for filling open positions. Taking it one step further, Ms. Smith says that in her case, when her appointment was not renewed and/or did not result in a permanent position, Southern Union failed to follow even its unwritten (*albeit* improper) custom of allowing an employee's temporary position to transform into a permanent position.

The court need not decide whether any or all of Southern Union's alleged policy departures, in combination with the *prima facie* case, give rise to Title VII liability.  It is sufficient that the court finds that the totality of the evidence amply brings into question the legitimacy of Southern Union's only proffered non-discriminatory reason such that a reasonable jury could deduce that the asserted reason was not the true motivator for the termination.  The question of liability will be for the jury; therefore, this claim proceeds to trial.

**B.**   **Failure-to-Hire Claim**

Ms. Smith also contends that she was rejected for the advertised permanent position for a Recruiter/Academic Advisor on the basis of race and in retaliation for having filed an

EEOC charge.  With respect to these claims, the *prima facie* cases are analyzed separately below, followed by an integrated discussion of whether Ms. Smith has raised a jury issue on the question of whether Southern Union's proffered non-discriminatory and non-retaliatory reason for her non-selection is pretext.[10]

### 1.    *Prima Facie Case: Race Discrimination*

Southern Union has argued that the undisputed fact that an African-American applicant was selected for the position for which Ms. Smith applied prevents her from establishing a *prima facie* case.  (Def. Br. 10.)  It, however, has not cited any authority in support of that contention.

In *Jefferies v. Harris County Community Action Association*, 615 F.2d 1025 (5th Cir. 1980),[11] the former Fifth Circuit held that the plaintiff failed to prove at trial that a denied promotion was racially discriminatory.  *See id.* at 1030.  The *Jefferies* court relied upon a prior decision in which it was concluded that "[w]here both the person seeking to be promoted and the person achieving that promotion were women, 'because the person selected was a woman, we cannot accept sex discrimination as a plausible explanation for (the promotion) decision."  *Id.* (quoting *Adams v. Reed*, 567 F.2d 1283, 1287 (5th Cir. 1978)). In *Howard v. Roadway Express, Inc.*, 726 F.2d 1529 (11th Cir. 1984), rejecting *Jefferies* as

---

[10] The parties' arguments merge at the second and third stages of the *McDonnell Douglas* analysis.

[11] *See Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981).

12

a "*per se* rule," the Eleventh Circuit held that the district court misinterpreted the law by concluding that "there can be no racial discrimination against a black person who is not selected for a job when the person who is selected for the job is black." *Id.* at 1534 (internal quotation marks omitted).  The court in *Howard*, which was an appeal from the entry of summary judgment in the employer's favor, focused on what is required to establish a *prima facie* case of race discrimination.   The *Howard* court found *Jefferies* factually distinguishable, *see Howard*, 726 F.2d at 1534 & n.4, and found more on point a Fifth Circuit decision where the court "rejected the proposition that under *McDonnell Douglas* . . . , an absolute requirement for a prima facie case is a showing that after the plaintiff's discharge the defendant hired a person who was not in the plaintiff's protected class," *id.* at 1534 (citing *Jones v. W. Geophysical Co. of Am.*, 669 F.2d 280 (5th Cir. 1982)).  In *Jones*, it was said that "[t]he underlying purpose of the fourth element in the *McDonnell Douglas* formulation is precisely to establish this unlawful inference of discrimination.  But proof that the employer replaced the fired minority employee with a nonminority employee is not the only way to create such an inference."  669 F.2d at 284; *see also Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005) (A hiring selection within the same protected class as the plaintiff "cut[] strongly against any inference of discrimination," but does not prevent a plaintiff from establishing a *prima facie* case of discrimination.).

In *Howard*, the Eleventh Circuit concluded that the fact that an African-American was hired after the employer had rejected the African-American plaintiff's application was not

the deciding summary judgment factor.  *Howard*, 726 F.2d at 1535.  There was an eleven-month time lapse between the plaintiff's rejection and the hiring of another African-American, thereby "significantly diminish[ing] the reliability of the subsequent hiring as an indicator of [the employer's] intent at the time it rejected [the plaintiff's] application."  *Id.*  Additionally, during that eleven-month interim, the plaintiff had filed an EEOC charge, "suggest[ing] that the hiring might have been motivated by the filing."  *Id.*  "The hiring, then, would scarcely rule out the inference of discrimination in connection with the earlier denial of [the plaintiff's] application."  *Id.*  Also, the plaintiff urged that regardless of the race of the individual hired, he had been "denied employment as a result of a racially discriminatory practice, *i.e.*, the requirement that black applicants, unlike their white counterparts, undergo polygraph examination."  *Id.*  The grant of summary judgment in the employer's favor was reversed.  *See id.* at 1536.

With those authorities cited, it admittedly is a close call whether on this record the fact that an African-American was hired for the position for which Ms. Smith applied is a death knell to the establishment of her *prima facie* case, but it is not a call that the court is inclined to make in favor of Southern Union on the basis of its undeveloped argument.  Here, although it appears settled, unlike in *Howard*, that Ms. Smith and the chosen applicant were in the same pool of applicants being considered for the advertised vacancy for the Recruiter/Academic Advisor position,[12] this case is like *Howard* in that Ms. Smith filed an

---

[12] As to the ultimate issue of discrimination, footnote 4 in *Howard* would appear to weigh heavily against Ms. Smith.  *See* 726 F.2d at 1534 n.4.

EEOC charge during the selection process for the position, but before the hiring decision was made.  Hence, as in *Howard*, the fact that Southern Union hired an African-American applicant "only after [Ms. Smith] had filed a charge with the EEOC suggests that the hiring might have been motivated by the filing."  726 F.2d at 1535.  There also are, as has been discussed, allegations that Southern Union failed to follow its written policies for filling vacant positions.

Additionally, in further keeping with *Jones*'s admonition that the *prima facie* case is elastic, 669 F.2d at 284, the court has not overlooked Ms. Smith's argument that she has established the fourth element of her *prima facie* case because Ms. Howell is a similarly-situated comparator who was treated more favorably.[13]  Southern Union is correct that the proposed comparator "must be similarly situated 'in all relevant respects'" or, in other words, must be "nearly identical to the plaintiff[.]"  *Corbitt v. Home Depot U.S.A., Inc.*, ___ F.3d ___, 2009 WL 1981383, at *20 (11th Cir. July 10, 2009) (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004)).  Here, Southern Union argues that Ms. Howell is not a valid comparator, principally because she was a tenured employee, having been

---

[13] "In a traditional failure-to-hire case, the plaintiff establishes a prima facie case by showing that: (1) [s]he was a member of a protected class; (2) [s]he applied and was qualified for a position for which the defendant was accepting applications; (3) despite h[er] qualifications, [s]he was not hired; and (4) after h[er] rejection the position remained open or was filled by a person outside h[er] protected class." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1267 (11th Cir. 1999) (brackets added).  Here, only the fourth element is in contention, and it is subject to variation from the traditional model. *See id.* at 1268 (The *prima facie* case is not "rigid or inflexible.").  It is notable also that while a plaintiff can establish the fourth element of her *prima facie* case by showing that the position was filled by a person outside her protected class, as discussed herein, the inverse is not necessarily true, *i.e.*, that a showing that the position was filled by a person of the same protected class precludes the demonstration of a *prima facie* case.

employed by Southern Union since 1999.  (Def. Br. 11.)  There is a different angle from which to view Ms. Howell's tenure, however, one that is more appropriate on this record. It is the fact that Ms. Howell's initial temporary appointment turned into a permanent appointment after roughly seven months (Pls. Exs. 21-22), and that from there she was able to obtain tenure and ultimately a promotional appointment to a permanent position as a Recruiter/Academic Advisor.  These progressions arguably demonstrate that Ms. Howell has been treated more favorably than Ms. Smith.  In other words, it is arguable that Ms. Howell's tenured status does not render her dissimilarly situated to Ms. Smith, but rather shows that Ms. Howell was accorded more favorable treatment.  Southern Union's sole emphasis on Ms. Howell's tenured status as a factor that makes Ms. Howell dissimilarly situated, thus, is not persuasive.  In sum, based upon careful consideration of the arguments and the totality of the evidence, Ms. Smith's race-based failure-to-hire claim will be permitted to proceed past the *prima facie* case.

### 2. *Prima Facie Case: Retaliation*

"To make a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) [s]he engaged in an activity protected under Title VII; (2) [s]he suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action."  *Corbitt*, ___ F.3d at ___, 2009 WL 1981383, at *13.  Only the third element is challenged by Southern Union.  (Def. Br. 12.)

A causal connection can be established through evidence "'that the protected activity and the adverse action were not wholly unrelated.'"  *Brungart v. BellSouth Telecomms., Inc.*,

231 F.3d 791, 799 (11th Cir. 2000) (quoting *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1354 (11th Cir. 1999)).  "[T]o show the two things were not entirely unrelated, the plaintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action," *id.*, and that there is a "'close temporal proximity' between the protected expression and [the] adverse . . . action,'" *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (quoting *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003)).  As to temporal proximity, the Eleventh Circuit in *Higdon* recognized that it previously "ha[d] held that a period as much as one month between the protected expression and the adverse action is not too protracted."  *Id.*

Southern Union says that because the "hiring process" for the Recruiter/Academic Advisor position "had begun well before" Ms. Smith filed her EEOC charge on September 7, 2007, there is no causal connection between her non-selection and the protected activity. (Def. Br. 12.)  But, this argument is perfunctory, and ignores the timeline of the hiring process.  It is true that Ms. Smith filed her EEOC charge *after* she submitted her application for the open Recruiter/Academic Advisor position on August 13, 2007; however, a memorandum from the committee chair to President Salatto, dated September 18, 2007, reveals that Ms. Smith's interview occurred *after* Ms. Smith filed her September 7 EEOC charge.  As to when Ms. Smith was rejected, there is evidence that the three finalists were recommended to President Salatto for a final interview on October 4, 2007.  (Ex. 26 to Salatto Dep. (Doc. # 20-7, at 25).)  Because Ms. Smith was not one of the three finalists, her rejection occurred at the latest on October 4.  Given this timeline, at the outer limit, less than

17

one month transpired between Ms. Smith's filing of her EEOC charge (September 7) and her rejection for the Recruiter/Academic Advisor position (October 4).  There, thus, is temporal proximity between the protected activity and the adverse employment action.  *See Higdon*, 393 F.3d at 1220.

Focusing on the committee as the decisionmaker, given that it is the entity that whittled down the applicant pool to three and eliminated Ms. Smith in that process, Southern Union also has argued that "there is no evidence that the committee . . . was even aware of the fact that Ms. Smith had filed an EEOC charge."  (Def. Br. 12.)  In her response, Ms. Smith has not mentioned the knowledge component, instead focusing solely on temporal proximity to establish the required causal connection.  (Pl. Resp. 16.)

In *Brungart*, the Eleventh Circuit explained that "[t]he *general rule* is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection."  231 F.3d at 799  (emphasis added); *see also Higdon*, 393 F.3d at 1220.  *Brungart*, however, recognized that "there is this exception" to that general rule: "[T]emporal proximity alone is insufficient to create a genuine issue of fact as to causal connection where there is *unrebutted* evidence that the decision maker did not have knowledge that the employee engaged in protected conduct."  231 F.3d at 799 (emphasis added); *see also Corbitt*, ___ F.3d at ___, 2009 WL 1981383, at *14 (citing *Brungart* with approval).

18

In *Brungart*, the summary judgment record contained express testimony from the decisionmaker that when he terminated the plaintiff, he was not aware that the plaintiff had engaged in statutorily-protected conduct, and there was no evidence contradicting his testimony. 231 F.3d at 794. Similarly, in *Hudson v. Southern Ductile Casting Corp.*, 849 F.2d 1372 (11th Cir. 1988), also on appeal from a summary judgment ruling, there was "uncontradicted" evidence that when the plaintiff was fired, the decisionmaker was unaware that several years earlier the plaintiff had threatened to file an EEOC charge of discrimination concerning a denied promotion. *Id.* at 1376; *see also McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986) (affirmative evidence of the absence of knowledge by the decisionmaker of protected activity defeated the retaliation *prima facie* causation element).

The facts in this case are distinguishable from those in *Brungart*, *Hudson*, and *McCollum*. In each of those cases, the employer offered *affirmative* evidence from the decisionmaker that he had no knowledge of the protected conduct. Southern Union has not pointed to any evidence in the record that affirmatively demonstrates that, during the selection process, no member of the committee or President Salatto had knowledge that Ms. Smith had filed an EEOC charge on September 7, 2007. For instance, no affidavit or deposition testimony from any of the committee members has been submitted, and President Salatto's testimony is silent on this point. There is no evidence at all on the issue of knowledge and, thus, no evidence that stands "unrebutted." *Brungart*, 231 F.3d at 799. Hence, the *Brungart* exception that exists when there is unrebutted or uncontradicted evidence of an absence of knowledge is not applicable in this case, and therefore, the general

19

rule remains in play.  The causal connection, thus, is established for summary judgment purposes on the evidence of temporal proximity.

### 3.      Legitimate, Non-Discriminatory and Non-Retaliatory Reason

Southern Union has demonstrated a legitimate non-discriminatory and non-retaliatory reason for not selecting Ms. Smith for the advertised position of Recruiter/Academic Advisor.  It has submitted competent evidence that it advertised for the position, accepted applications, and established a five-person committee in accordance with governing policies. That evidence also demonstrates that Ms. Smith, although selected from the applicant pool for an interview, was not one of the three finalists submitted to President Salatto for final selection.  (Def. Br. 7-8; Salatto Aff. 2.)

### 4.      Pretext

As a demonstration of pretext, Ms. Smith relies again on her evidence of Southern Union's alleged departures of established policies in its hiring practices.  Admittedly, the question of whether Southern Union's proffered reason for Ms. Smith's non-selection is pretextual is a close call.  This is so, in part, based upon the strength of Southern Union's evidence that the procedures for filling the vacant position for the Recruiter/Academic Advisor were followed,[14] and the uphill battle Ms. Smith faces, at least as to her discrimination claim, in that an African-American was selected for the position.  Regardless,

---

[14] There is no contention that Southern Union violated the procedural requirements for advertising the permanent Recruiter/Academic Advisor position for which Ms. Smith applied on August 13, 2007.  There also is no contention that the policies for forming the five-member hiring committee were not followed.  (*See generally* Mary Jean White Aff. (explaining the selection process used to fill the advertised Recruiter/Academic Advisor position for which Ms. Smith applied) (Doc. # 20-8).)

the court has the discretion, which it will exercise here, to permit these claims to proceed to trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Neither do we suggest that the . . . trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.").  In short, summary judgment will be denied.

## VI.  CONCLUSION

Accordingly, it is ORDERED that Southern Union Community College's Motion for Summary Judgment (Doc. # 20) is DENIED.

DONE this 23rd day of July, 2009.

/s/  W.  Keith Watkins
UNITED STATES DISTRICT JUDGE